UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | CIVIL ACTION<br>No. 03-10762-PBS |
| CHANCELLOR CORPORATION, BRIAN ADLEY, FRANKLYN CHURCHILL, DAVID VOLPE, JONATHAN EZRIN, RUDOLPH PESELMAN, GREGORY DAVIS and BKR METCALF DAVIS, | |
| Defendants. | |

## BRIAN ADLEY'S
## TRIAL BRIEF

**1.      Summary of Evidence to Be Offered by the Defendant**

Chancellor Corporation (Chancellor) was a truck leasing company. Brian Adley started out as a consultant, director and shareholder of Chancellor. As early as 1995, Adley began to put his own money into the company. Adley became the Chairman of the Board of Directors of Chancellor in 1996 in the hope of "turning around" Chancellor. For several years prior to Adley's assumption of his duties as Chairman of the Board of Directors, the company had lost large sums of money. Adley began to get rid of Chancellor's debt and hired people to assist the company in getting back on track.

The former executives of Chancellor had unreasonably high salaries, and essentially drove the company into the ground. However, Adley saw potential in Chancellor.

1

Due to Chancellor's poor financial state in the mid-1990's, Chancellor was unable to obtain to secure lines of credit in order to operate. Upon putting money into the company and becoming more involved, Adley began negotiating with Chancellor's creditors and Vestex Capital, a company in which Adley is a principal of, and became Chancellor's sole lender. Adley used other means to further reduce Chancellor's debt, such as buying out the company's lease, moving its headquarters, and infusing capital into the company.

Adley brought an organizational specialist into Chancellor to further assist with day to day operations. Shortly thereafter, Adley caused Chancellor to pursue monies owed to the company that the former Board of Directors failed to pursue. All the while, Adley and/or Vestex were continuing to infuse capital into Chancellor.

Adley hired new personnel to assist Chancellor in pursuing new opportunities such as the New Africa Opportunity Fund and various other ventures. Among those hired was David Volpe, who purportedly had vast SEC accounting experience and who later became acting CFO. Volpe also informed Adley that he was a Massachusetts CPA. Chancellor enhanced its international distribution and began searching for domestic distribution opportunities.

In 1998, Adley continued to try to restore the company's image. Eventually, for the first time in 10 years, Chancellor was becoming profitable due to the exploration of various business and acquisition opportunities. In 1998, Adley hired Frank Churchill, a truck leasing expert, who formerly worked at GE Capital and Associates.

Chancellor signed a letter of intent to acquire MRB, Inc. (MRB), and Chancellor and MRB were scheduled to close on the transaction in Q3 or Q4 of 1998. Chancellor eventually closed on the transaction in early 1999.

Chancellor consolidated the MRB acquisition on the 1998 financial statements at the insistence of Mr. Volpe, the company's acting CFO. This position was also supported by the company's auditors and legal counsel.

The SEC notified Chancellor that its financial statements needed to be amended to include the MRB acquisition in a footnote of the 1998 financial statement. Additionally, the SEC had other issues with Chancellor's 1998 financial statement. On several other occasions, the SEC continued to require Chancellor to restate its financial statements at a great expense to Chancellor, despite the fact that Chancellor properly disclosed material information. Notwithstanding the SEC's contentions, Adley denies directing or even knowing that the first amendment to the management agreement was fraudulent.

Part of the issue that the SEC had, relative to Chancellor's financial statements, was the alleged improper reporting of the Vestex fee. The SEC insisted that this fee should be reported as an expense as opposed to being capitalized. Adley maintains that the Vestex fee was properly disclosed, and that this fee was to be paid based upon the performance of the newly acquired MRB. Therefore, capitalization of the Vestex fee was appropriate. Further, the Vestex fee of $3.25 million was never earned. A little over $1 million was paid to Vestex, which was used to reimburse Adley/Vestex and/or to put money back into Chancellor.

Adley and Vestex continued to act as a bank for Chancellor by putting money into Chancellor and getting repaid by Chancellor. As part of this, Adley placed mortgages on

his personal property (and that of his wife) in order to provide needed capital to Chancellor. Merrill Lynch approached Chancellor to provide cash management services and related financial services including 401K management for the company.

Chancellor asked Merrill Lynch to loan it money so that Adley did not have to loan the money himself. Merrill Lynch did not want to finance Chancellor, but suggested that if Vestex gave up its secured position in Chancellor's assets, and if Brian Adley and his wife would personally guarantee a line of credit and pledge their own assets, Merrill Lynch would give Chancellor a line of credit. In accordance with the terms set forth by Merrill Lynch, the Adleys mortgaged their property to secure money in order to guarantee the Merrill Lynch line of credit for Chancellor, and Vestex relinquished its secured position with Chancellor. Thus, Merrill Lynch was secured in order to provide Chancellor a line of credit. At no time were Chancellor's shareholders at risk. Further, Merrill Lynch never sent Adley or Chancellor any notices of default during this time period, and Merrill Lynch had constant access to monitor Chancellor's line of credit and all guarantee accounts.

## 2.    **Facts Established By the Pleadings, Stipulations or Admissions of Counsel**

Adley states that the parties are in the process of discussing potential stipulations, which may reduce the number of potential witnesses, reduce the number of potential trial exhibits, and narrow the issues for trial.

## 3.    **Contested Issues of Fact**

The primary issues of contested fact to be decided by the jury in this matter are whether Adley committed securities law violations, including specifically:

    A.    Did Adley, directly or indirectly, by use of the means or instruments of

interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly (a) employed devices, schemes and artifices to defraud; (b) make untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engage in acts, transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of Chancellor securities and upon other persons, in connection with the purchase or sale of Chancellor securities? [Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.]

  B. Did Adley aid and abet Chancellor's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1] in connection with Chancellor's filing of false and misleading annual reports for 1998 and 1999?

  C. Did Adley aid and abet Chancellor's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-13] in connection with Chancellor's filing of false and misleading quarterly reports for 1999 and 2000?

  D. Did Adley aid and abet Chancellor's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-11] in connection with Chancellor's filing of false and misleading current reports on Form 8-K in 1999?

  E. Did Adley aid and abet Chancellor's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] in connection with Chancellor's failure to

keep and to maintain books, records and accounts which, in reasonable detail, accurately and fairly reflected the transactions of disposition of the company's assets?

F.  Did Adley aid and abet Chancellor's violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)] in connection with Chancellor's failure to devise and to maintain a system of internal controls sufficient to ensure the preparation of financial statements in conformance with GAAP?

G.  Did Adley violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1] by knowingly circumventing and/or knowingly failing to implement a system of internal controls or knowingly falsifying any book, record or account of Chancellor?

H.  Did Adley violate Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2] by making or causing to be made any materially misleading statement to an accountant, in connection with the preparation or filing of any required document or report with the Commission?

**4.  Jurisdictional Issues**

Adley states that there are no jurisdictional issues in dispute in this case.

**5.  Pending Motions**

On October 22, 2007, Defendant, Brian Adley, filed the following motions in limine designed to narrow the evidentiary issues for trial:

A.  Motion in limine to preclude testimony regarding alleged harassment and/or sexual harassment by Adley;

B.  Motion in limine to preclude testimony of Sean Adley;

C.  Motion in limine to preclude evidence of Adley's involvement in *Sanborn*,

*Inc.*;

    D.    Motion in limine to preclude evidence pertaining to Adley's involvement in a lawsuit concerning *Marketechs*;

    E.    Motion in limine to preclude the SEC's introduction of certain exhibits or portions of exhibits;

    F.    Motion in limine to preclude evidence pertaining to whether or not the Vestex Fee was excessive;

    G.    Motion in limine to preclude arguments and other statements concerning *Enron* or other securities fraud/ accounting cases;

    H.    Motion in limine to preclude testimony regarding the sale of stock by Ann Adley.

## 6. Issues of Law

### I. Primary Legal Issues

Whether, in connection with each of the aiding and abetting claims against Adley, the SEC must prove that Adley *knowingly* provided substantial assistance of the alleged primary violations of the Act by Chancellor; or, if the SEC must merely prove that Adley *recklessly* provided substantial assistance of the alleged primary violations of the Act by Chancellor?

The SEC argues that aiding and abetting liability for violations of the Act extends to reckless assistance of primary violations of the Act. Mr. Adley urges this Honorable Court to follow the word of the statute, which clearly requires that the SEC prove that Mr. Adley *knowingly* provided substantial assistance of the alleged primary violations of the Act by Chancellor.

In 1994, the United States Supreme Court held, in <u>Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994), that no private action can be asserted for damages against one merely aiding and abetting a violation of Rule 10b-5. After <u>Central Bank</u>, the SEC was sufficiently concerned about its authority that it announced its intention to seek legislation "providing that the Commission can seek injunctions and other relief against aiders and abettors." <u>See</u> 26 Sec. Reg. & L. Rep. (BNA) 1055-56 (July 29, 1994). In response to the concerns raised by the SEC, Congress passed the Private Securities Litigation Reform Act in 1995, and, in pertinent part, provided, vis-à-vis an amendment to Section 20 of the Securities and Exchange Act (15 U.S.C. 78t), that the SEC may obtain an injunction or civil penalties against "any person that *knowingly* provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title" Pub.L. 104-67, Title I, Section 104 (1995) (emphasis supplied).

Based on a plain reading of the language of Section 20 of the Act, Congress clearly intended to restrict aiding and abetting liability to cases wherein the defendant **knowingly** provides substantial assistance of a primary violation of the Act. In enacting the Private Securities Litigation Reform Act, Congress explicitly **rejected** the SEC's request for authority to prosecute persons who *recklessly* aid and abet violations of the Act. <u>See</u> 141 Cong. Rec. S9056 (June 26, 1995).

Accordingly, Mr. Adley requests that this Honorable Court follow the letter of the law and further Congressional intent by instructing the jury that the SEC must prove, by the preponderance of the evidence, that Mr. Adley *knowingly* provided substantial assistance of the alleged violations of the Act by Chancellor, with respect to each of the

SEC's aiding and abetting claims against Mr. Adley.

Mr. Adley further requests that this Honorable Court instruct the jury that constructive knowledge in the form of recklessness, i.e., that Mr. Adley "should have known," will not suffice to sustain a verdict against Mr. Adley. See also Central Bank of Denver, 511 U.S. at 175, citing Pinter v. Dahl, 486 U.S. 622, 653 (holding that "the ascertainment of congressional intent with respect to the scope of liability created by a particular section of the Securities Act must rest primarily on the language of that section").

## II.   Issues Pertaining to Legal Relief

Depending on the jury's findings of liability, this Court must also decide what, if any, relief should be entered, including:

A. Whether Adley should be enjoined from, directly or indirectly, violating Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, 13b2-1 and 13b2-2;

B. Whether, and in what amount, Adley should be required to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act;

C. Whether, and in what amount, Adley should be required to disgorge funds received from Chancellor;

D. Whether Adley should be enjoined from serving as an officer or director of any publicly traded issuer pursuant to Section 21(d)(2) of the Exchange Act; and,

E. Whether any additional relief would be just and appropriate under the circumstances.

**7.   Requested Amendment to the Pleadings**

Mr. Adley opposes any motion to amend the pleadings

**8.   Probable Length of Trial**

Adley anticipates approximately one week to present his case. Adley anticipates calling fact witnesses and one expert witness.

**9.   List of Proposed Exhibits**

Mr. Adley expects to offer as exhibits the documents listed on his separately filed exhibit lists. Mr. Adley reserves his right to add additional exhibits upon reasonable notice and depending on the outcome of the various pending motions.

**10.  Pretrial disclosures**

Adley has served his 26(a)(3) disclosures and provided his exhibits to the SEC.

**11.  Requests for Instructions**

Adley filed his proposed jury instructions.

Respectfully Submitted,

Dated: **October 25, 2007**

/S/ Todd J Bennett

Todd J. Bennett
BBO # 643185
Corrigan, Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141
Tel:   617-577-8800
tbennett@corbenbel.com

10

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 25th day of October, 2007 I served a copy of the foregoing to Daniel O'Connor, Esq., Securities and Exchange Commission, **Boston Regional Office,** 33 Arch Street, 23rd Floor, Boston, MA 02110-1424, (617) 573-8900

/S/ Todd J. Bennett

Todd J Bennett