UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION |
| | : No. 03-10762-PBS |
| CHANCELLOR CORPORATION, BRIAN ADLEY, FRANKLYN CHURCHILL, DAVID VOLPE, JONATHAN EZRIN, RUDOLPH PESELMAN, GREGORY DAVIS and BKR METCALF DAVIS, | : |
| Defendants. | : |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
REVISED REPLY MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR REMEDIES**

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") hereby respectfully submits this revised reply memorandum of law in support of the Court's entry of a Final Judgment against Defendant Brian Adley ("Adley").[1]

**ARGUMENT**

Adley's arguments related to disgorgement in his opposition to the SEC's motion for remedies ignore the evidence developed at trial, as well as common sense, and should be disregarded. Every witness, other than Adley, who testified about the bogus Vestex fee (Ezrin, Davis, and Simpson) confirmed that Adley's firms received some substantial portion of the bogus Vestex fee. Moreover, Adley signed the Form 10-KSBA for 1999 filed by Chancellor in August 2000 that clearly states:

> Additionally, Vestex Capital Corporation, . . . is to receive up to $3,250,000

---

[1] This reply brief is revised from the paper provided by hand at the December 20, 2007 hearing. The revisions are designed to address questions that arose at the hearing and eliminates the SEC proposed alternative disgorgement calculation.

>plus expenses, not to exceed $50,000, payable over the next six years for services rendered in finding, negotiating and arranging financing on the transaction as well as ongoing management and development of long-term growth strategies including initiation of possible acquisition and/or merger candidates. . . . **Approximately $1,019,000 and $300,000 was paid in fees and expenses and charged to operations during 1999 and 1998 respectively.**

(Ex. F to the SEC's MOL in Support of its Motion at 65 (emphasis added).) For Adley to now claim, as he does in his opposition, that no fee was paid is patently absurd. (See Adley's Opp'n at 14.)

    A.    **The SEC's Proposed Vestex Disgorgement Amount**

The SEC proposes that the Court calculate the disgorgement amount owed in connection with the bogus Vestex fee by comparing the Tomahawk-related fee and expense amounts listed as paid to Vestex in the 2000 Form 10-KSBA with the legitimate fee that Adley's firms were entitled to as described by Jon Ezrin in his trial testimony. During trial, Jon Ezrin testified that under the agreement in place in 1998 between Chancellor and Vestex, Chancellor was to pay Vestex a fee equal to 7.5% of the value of any equity issued in the course of a transaction completed by Chancellor, as well as a fee equal to 3% of the value of any financing that Chancellor received in connection with any transaction. (Ex. 1 hereto, excerpts of Ezrin Test., Day 7 11/7/07, pg 955:1 to 956:6.) Ezrin also testified that this agreement was documented in Chancellor's 1998 Form 10-KSB, which was filed in April 1999 and signed by Brian Adley. (Id. at 955:11 to 955:19; Ex. 2 hereto, excerpts of Trial Ex. 47, Chancellor's 1998 Form 10-KSB, 4/16/99, at 61(emphasis added).) Adley also acknowledged the existence of this arrangement in his trial testimony. (Ex. 1, excerpts of Adley Test., Day 9 11/9/07, pp. 1390:13 to 1391:3.)

At trial, Ezrin walked through the calculations for the legitimate Vestex fee on the

Tomahawk transaction using the agreement described above and testified that Vestex should have received a fee of approximately $339,000 based on the stock issued and financing obtained by Chancellor in connection with the deal. (Ex. 1, Ezrin Test., Day 7 11/7/07, pp. 956:7 to 957:21.) The SEC used the calculation methodology described by Ezrin and displayed the calculations its Memorandum of Law ("MOL") in Support of its Motion for Remedies reaching the same result as found by Ezrin, $339,000. (See SEC's MOL in Support of Its Motion for Remedies, pp. 16-17). The SEC then considered whether on top the fee, Adley should have received compensation for any expenses that he or his companies paid in connection with the Tomahawk transaction. The only credible witness who was able to testify about ever seeing any receipts for such payments was Greg Davis, and he stated that he saw receipts in early 2000 totaling $50,000.[2] (Ex. 1, Davis Trial Test. Day 8 11/8/07, pp. 1119:5 to 1120:8.) Thus, combining the legitimate $339,000 fee with the only

---

[2] With respect to the issue of legitimate Vestex/VMI expenses incurred in connection with the Tomahawk transaction, Jon Ezrin, Chancellor's controller and the person at the company responsible for tracking the Chancellor/Vestex-VMI financial relationship, testified:

    Q. To what extent, if any, did you see receipts wherein Vestex or Tomahawk had paid money on behalf of Chancellor to consultants or other third parties to help out with the Tomahawk transaction?
    A. I don't recall seeing any of that.

(Ex. 1, Ezrin Test. Day 7 11/7/07, pg. 971:3 to 971:7.) David Volpe, the person that Adley placed in charge of the diligence process for the Tomahawk transaction also testified at trial as follows:

    Q. So due diligence took months. And wasn't due diligence very expensive for Chancellor? It took several hundred thousand dollars?
    A. Uhm, I can't remember the exact -- the exact dollar amount. It -- it might have been $50,000 to $100,000.
    Q. Is that a guess?
    A. Excuse me?
    Q. Is that a guess?
    A. Yes, it is.
    Q. Well, Vestex was reimbursed for the several hundred thousand dollars of due diligence costs and $500,000 that it put into the acquisition cost, it was paid back for that, wasn't it?
    MR. O'CONNOR: Objection, your Honor.
    THE COURT: Overruled.
    A. I don't know what Vestex was paid back, and I – I highly doubt that the due diligence cost $200,000.

(Ex. 1, Volpe Test. Day 3, 10/31/07, pp. 278:21 to 279:4 and pp. 282:10 to 282:17.)

verified expenses of $50,000, results in a combined amount of $389,000, when in fact Chancellor paid out at least $1.319 million to Adley's firms in 1998 and 1999 (i.e. Adley took $930,000 more than he was entitled).

### B.   Adley's Alternative Disgorgement Calculations

In his reply brief, Adley accepts as valid the fee calculation as described by Ezrin, but wrongly argues that the SEC does not take into account additional legitimate expenses. Adley makes the astonishing claim that he is actually owed money in connection with the Tomahawk transaction. He gets there by adding up unsupported expenses and unrelated loans from third parties. "The SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment, [but] once the SEC has made a reasonable showing of a defendant's illicit profits, the burden shifts to the defendant to show that the disgorgement figure was not a reasonable approximation." *Opulentica,* 479 F. Supp. 2d at 330 (S.D.N.Y. 2007) (citing *S.E.C. v. First City Fin. Corp., Ltd.,* 890 F.2d 1215, 1232 (D.C. Cir. 1989)). As discussed below, Adley has failed to meet his burden of proof and his analysis is at best inaccurate, and should simply be disregarded.

Adley first claims that he paid and was owed reimbursement of $100,000 in undefined "due diligence expenses." While it is good to see that Adley is backing off of the $600,000 to $700,000 in expenses that he claimed to have paid at trial, the $100,000 is still too high and completely contrary to the testimony of credible witnesses. Greg Davis is the only witness that claimed to see any receipts evidencing expenses paid by Adley or his firms. Davis testified that in connection with the work completed in April 1999 on the audit of Chancellor's 1998 financial statements, he repeatedly asked Adley and others for receipts and papers justifying the Vestex $3.2 million fee but

received nothing. (Ex. 1, Davis Trial Test. Day 8 11/8/07, pg. 1119:5 to 1119:25). Following a November 1999 meeting with the SEC at which the SEC told Chancellor that it needed to do a restatement, Davis' firm once again requested all receipts and documents related to the Vestex fee. (Ex. 3 hereto, Trial Ex. 217, 11/18/99 Memo from Metcalf Davis to Adley (emphasis added).) Davis testified that it was not until 2000, when Chancellor was completing its restatement brought about by the SEC inquiry, that he for the first time saw receipts, and only then in an amount of $50,000.   (Ex. 1, Davis Trial Test. Day 8 11/8/07, pg 1120:1 to 1120:8.)  Davis' testimony is supported, as noted above, by the testimony of David Volpe and Jon Ezrin who both testified at trial that they were not aware of Adley, Vestex or VMI paying substantial expenses in connection with the Tomahawk transaction.

Adley now also claims that he paid $120,000 to RFS for their diligence work, when in fact no such evidence was offered at trial and strangely he didn't even question the RFS partner who testified at trial, Phil Weitzel, about the matter. This claim seems to be a simple fabrication by Adley, both as to the amount and whether it was paid by him versus Chancellor. Several documents that Adley proposed as exhibits, but did not actually use at trial make it clear that RFS charged $22,000 for its work on the Tomahawk transaction, not $120,000:

> 1. On December 28, 1998, Brian Adley wrote a letter to RFS to complain about billing matters and two attachments to the letter state that the RFS Tomahawk consulting fee was $22,000. (Ex. 4 hereto, excerpts of Adley's Proposed Trial Exhibit 338, Exhibits C and D to Adley 12/28/98 letter to RFS (emphasis added).)
>
> 2. On May 15, 2001, Brian Adley wrote a letter to his then attorney and once again attached an exhibit that discussed an RFS invoice containing a chare of $22,000 for "Consulting on Tomahawk." (Ex. 5 hereto, excerpts of Adley's Proposed Trial Exhibit 547, Adley 5/15/01 letter to Atty. Michael Kendal (emphasis added).)

These same exhibits contain a summary of fees and canceled checks showing that to the extent that payments were made on the fees owed to RFS, and it appears that a substantial portion went unpaid, it was Chancellor, not Adley or his firms making the payments.  For example, Exhibit 5 hereto contains a sheet titled "Resnick Fedder and Silverman 1998 Invoices and Services Provided" that appears to list all of the invoices sent to Chancellor in 1998 and the payments made in satisfaction of the debt.  The sheet lists ten payments being made to RFS in 1998 and 1999, the first on 1/30/1998 and the last on 2/2/99.  (Ex. 5.)  Attached to the statement are copies of the supporting checks, all of which are drawn on a Chancellor account and signed by Jon Ezrin and another Chancellor officer.  There are no payments listed as having been made by Adley or either of his firms, and counsel for the SEC is unaware of any such evidence being in existence.

Finally, Adley claims credit for $770,000 in payments made to Tomahawk's owners in connection with the closing - $550,000 for a "Closing Fee for Tomahawk Acquisition" and $200,000 for a "Tax Liability Payment to Tomahawk."  This claim appears to relate to the monies paid by Chancellor in accordance with the Stock Purchase Agreement ("SPA") executed in January 1999.  (Ex. 6 hereto, excerpts of Trial Ex. 58, Stock Purchase Agreement (emphasis added).)  Adley's proposed numbers appear, however, to be overstated and he has failed to provide any admissible proof that Adley or his firms actually paid any of the debts giving rise to alleged claim.  The Stock Purchase Agreement called for Chancellor to pay the following amounts to the two owners of Tomahawk at the closing:

| | | |
|---|---|---|
| 1. | $25,000 each in repayment of loans made by the two sellers to Tomahawk (Ex. 6, SPA ¶ 4.1) | $50,000 |
| 2. | Loans of $150,000 each to the two sellers (Id. at ¶ 4.2) | $300,000 |
| | Total | $350,000 |

There are several provisions of the SPA that contemplate additional payments to the two owners of Tomahawk subsequent to closing (Ex. 6, SPA ¶¶ 4.1, 4.4, and 4.5), including one related to reimbursement of tax liability, but Adley has offered no proof that these payments were made, let alone funded by him or his firms as opposed to Chancellor.  Moreover, there is no credible proof that shows that Adley or his firms provided any of the money used by Chancellor to close the Tomahawk transaction.  Even Adley admitted that what he did in connection with the Tomahawk transaction was to facilitate Chancellor's receipt of a $550,000 loan from another Chancellor employee, Laurence Stern.  (Ex. 1, Adley Trial Test., Day 8 11/8/07, pg.1303:10 to 1303:18.) Finally, to the extent that there is any proof that Adley did provide cash to Chancellor for its use in closing the Tomahawk transaction, there is zero evidence showing that any of the $1.319 million paid out in 1998 and 1999 was in any way designed to reimburse Adley for money loaned to the company as opposed to services rendered.

**Conclusion**

For the foregoing reasons, the Commission respectfully requests that the Court enter a Final Judgment: (1) permanently prohibiting Adley from acting as an officer or director of a public company; (2) ordering disgorgement of $2,134,967.40; (3) permanently enjoining Adley from future violations of Section 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, 13b2-1 and 13b2-2; and, (4) imposing a maximum third tier penalty.

Respectfully submitted,

/s/ R. Daniel O'Connor
R. Daniel O'Connor
 oconnord@sec.com
 Senior Trial Counsel (BBO# 634207)
Britt Kathleen Collins
 collinsb@sec.gov
 Senior Enforcement Counsel (BBO# 643593)
ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, Massachusetts 02110
(617) 573-8900
(617) 573-4590 (Facsimile)

Dated:  December 21, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that there are no non registered participants to whom service must be made.

/s/ R. Daniel O'Connor
R. Daniel O'Connor (BBO# 634207)